**AFFIDAVIT IN SUPPORT OF APPLICATION FOR COMPLAINT**

**AND SEARCH WARRANT**

I, Kyle Montagano, being duly sworn, state the following:

**Introduction**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am also an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA") assigned to the Providence, Rhode Island District Office within the New England Field Division. I graduated from UMass Boston in 2010 with a Bachelor of Arts degree in Criminal Justice. I was a police officer with the Bridgewater Police Department from 2013 to 2021. From 2016 to 2021, I was assigned full-time to the DEA as a sworn federal Task Force Officer ("TFO"). I have been a Special Agent with DEA since May 2021. Prior to my assignment to the Providence Office, I attended a sixteen-week-long DEA Basic Agent Training Academy in Quantico, Virginia. While at the academy, I received training in drug enforcement investigations including, but not limited to, drug identification, surveillance, undercover operations, communications, interview and interrogation, confidential source handling, evidence handling, firearms, and case development.

3.      As a Special Agent of the DEA, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws in Title 21 of the United States Code.

4.      As a Special Agent and TFO, I have written and/or participated in the execution of numerous search warrants resulting in the seizure of: large quantities of controlled substances; paraphernalia involved in the manufacture and distribution of controlled substances; United States currency; records of narcotics and monetary transactions; and drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations, including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones. I have received extensive specialized training in the fields of controlled substance identification, investigation, and enforcement.

5.      By virtue of my employment as a police officer and assignment as a DEA Special Agent and TFO, I have performed and continue to perform various duties, including, but not limited to: working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in illegal drug trafficking; working as a case agent directing the investigation of various illegal drug traffickers and their organizations; and directing investigations involving complex conspiracies.

6.      Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity.  I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.   I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

7.      I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.  I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, communication apps, and other means to facilitate their illegal activities.

8.      Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge of the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

**<u>Purposes of Affidavit</u>**

9.      I submit this affidavit in support of:

3

    a.   An application for a criminal complaint charging Luis Sonier BAUTISTA

        MORETA with date of birth xx/xx/1996 and social security number xxx-xx-6336

        with two violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi) (possession

        with intent to distribute 400 grams or more of fentanyl) (the "Target Offenses");

        and

    b.   An application for a search warrant to search 238 Westview Street, Boston, MA

        02124 (the "Target Location").  The Target Location is more specifically

        described in Attachment A, which I incorporate by reference.

10.     Based on the facts set forth in this affidavit, there is probable cause to believe that

BAUTISTA MORETA has committed the Target Offenses and that evidence of the commission

of the Target Offenses will be located at the Target Location.

11.     I am a Special Agent and have conducted this investigation working closely with

other DEA Special Agents and law enforcement personnel.  Accordingly, I am familiar with the

facts concerning this investigation.  The facts in this affidavit come from my personal

observations, my training and experience, and information obtained from other agents and

witnesses.  This affidavit is intended to show that there is probable cause for the complaint and

search warrant and does not set forth all of my knowledge about this matter.

**Probable Cause**

12.     Since October 2021, the DEA has been investigating BAUTISTA MORETA for

violations of the Target Offenses.

13.     In or around October 2021, Providence-based DEA investigators learned that an

unidentified male who uses the name of "Yogueta" and resides in the Dominican Republic supplies

fentanyl to customers in the United States.  On October 21, 2021, an undercover Rhode Island

state police detective (the "UC") contacted "Yogueta" at telephone number 829-510-1660—a Dominican telephone number—to arrange a purchase of fentanyl.  During the telephone call, "Yogueta" used the terms "comida" (food), "pantalones" (pants), and "buttons."  The UC understood, based on his experience, that comida and pantalones referred to kilograms of fentanyl. He understood that buttons referred to pills.  Based on my training and experience, I know that such code words are frequently used by drug traffickers in order to thwart law enforcement.

14.    Using those code words, "Yogueta" agreed to sell to the UC: (1) one kilogram of fentanyl for $36,000, and (2) 10,000 pills containing fentanyl for $4 per pill (total $40,000). "Yogueta" agreed to "front" the drugs to the UC—that is, to deliver them on credit—other than that the UC would pay a $1,000 fee for transportation costs.  "Yogueta" told the UC that he would put the UC in touch with an individual whom "Yogueta" referred to as his brother.

15.    On October 22, 2021, the UC and "Yogueta" exchanged a series of communications to finalize the location, amounts and price for the drugs.  They discussed a plan for the UC to meet "Yogueta's" brother.  "Yogueta" then placed the UC in contact with telephone number 617-749-7032 (the "7032 Telephone"), which "Yogueta" said was his brother's number, to complete the drug transaction.  The UC then spoke with a male later identified as BAUTISTA MORETA on the 7032 Telephone.  The two agreed to meet later that day in the parking lot of the Home Depot located at 1100 Newport Avenue in Attleboro, Massachusetts.

**The October 22 Drug Transaction**

16.    On October 22, 2021, at approximately 3:30 p.m., investigators established surveillance at the meet location in Attleboro.  Investigators took to the meet location an individual

who operates as a confidential source for the DEA (the "CS")[1] to pose as an associate of the UC who was to receive the drugs and pay the $1,000 transportation fee. At approximately 3:40 p.m., the UC received communications from BAUTISTA MORETA using the 7032 Telephone. BAUTISTA MORETA stated that he was ten minutes away. The UC and BAUTISTA MORETA agreed that BAUTISTA MORETA would enter the UC's car and deliver the drugs (using the code words discussed earlier) to the UC inside the car. The UC described a car to the male that was actually the CS's car.

17.     Investigators then searched the CS and the CS's vehicle for the presence of contraband and found none. Investigators equipped the CS with audio- and video-recording equipment. Investigators gave the CS $1,000 of U.S. currency, the serial number of which investigators had previously logged.

18.     At approximately 3:49 p.m., BAUTISTA MORETA using the 7032 Telephone called the UC and said he had arrived at the meet location. At the same time an investigator saw a black Jeep Cherokee bearing Massachusetts registration 2AKN75 arrive in the Home Depot parking lot. The investigator saw a Hispanic woman operating the Cherokee and a Hispanic male sitting in the passenger seat. Investigators searched the Cherokee's registration and found a 2018 black Jeep Cherokee, with vehicle identification number 1C4RJFAG6JC123322, registered to Luis Sonier BAUTISTA MORETA of 17 Salisbury Street, Apt. 2, New Bedford, MA (the "Cherokee"). Investigators reviewed the audio/video equipment and verified the individual who entered the CS's vehicle was in fact the registered owner of the Cherokee (BAUTISTA MORETA).

---

[1] The CS has provided reliable information in several ongoing drug investigations that has resulted in the seizure of drugs and drug proceeds, and has made controlled buys for investigators. The CS has been convicted of prior drug offenses. The DEA compensates the CS for working as a CS. The CS is believed to be reliable.

19.     At approximately 3:54 p.m. an investigator saw BAUTISTA MORETA exit the Cherokee wearing a brown cross-body style bag and walk into the Home Depot.

20.     At approximately 4:03 p.m. an investigator saw BAUTISTA MORETA exit the Home Depot.  The CS drove to the front of Home Depot, where BAUTISTA MORETA entered the CS's vehicle.  The CS and BAUTISTA MORETA drove around the parking lot and eventually to the rear of Home Depot where the deal took place.

21.     At approximately 4:03 p.m., the UC called BAUTISTA MORETA using the 7032 Telephone and asked if the man was with the UC's "boy," meaning the CS.  BAUTISTA MORETA stated that he was.  Investigators then formed a belief that BAUTISTA MORETA was the person with whom the UC had been talking and texting.

22.     Once in the CS's vehicle, BAUTISTA MORETA took his cross-body bag off and removed from the bag (1) a rectangular brick-shaped object wrapped in green cellophane wrapping; and (2) a large plastic bag in which were smaller plastic bags that contained 6,000 pills. BAUTISTA MORETA placed these items on the passenger-side floor.  BAUTISTA MORETA, who appeared nervous, then quickly exited the vehicle without asking the CS for the $1,000.  The CS did not give the $1,000, or any money, to BAUTISTA MORETA.

23.     At approximately 4:05 p.m., an investigator saw BAUTISTA MORETA exit the CS's vehicle and walk toward the front of the Home Depot.  Investigators then followed the CS to a predetermined location and took custody of the suspected drugs.

24.     At approximately 4:09 p.m., the female driver of the Cherokee picked up BAUTISTA MORETA in front of the Home Depot and left the aera.  Investigators followed the Cherokee.

25.    At approximately 4:13 p.m., the UC received a call from "Yogueta" using the same Dominican number as before.  "Yogueta" told the UC that his "brother" did not receive the $1,000. The UC told "Yogueta" that the brother left too quickly.  "Yogueta" then gave the UC wiring instructions for the $1,000, but the UC did not wire any money to "Yogueta."

26.    At approximately 4:56 p.m., the Cherokee, which investigators were still following, arrived at the Target Location, 238 Westview Street in Boston.  An investigator saw the female driver and BAUTISTA MORETA exit the vehicle and enter the Target Location.  The Target Location is part of an apartment building with several separately numbered entrances.  During the investigation, investigators have entered the common areas of the building to determine the layout and have also examined maps.  Investigators noted that 238 Westview is not accessible from the common areas of the building and has its own fenced-in yard.  Based on this review, investigators believe the entrance to 238 Westview is not a common entrance and leads solely to one apartment.

27.    On October 25, 2021, investigators conducted a field test of the suspected kilogram of fentanyl that the CS received from BAUTISTA MORETA.  The substance field-tested positive for the presence of fentanyl.  I believe the substance is fentanyl.

**The November 1 Drug Transaction**

28.    On November 1, 2021, the UC contacted "Yogueta" at the previously used Dominican number to arrange for the UC to pay "Yogueta" $7,000 as partial payment for the drugs (using code words) received on October 22, 2021.  "Yogueta" agreed to this and agreed to supply the UC with another kilogram of fentanyl (using the prior code words) at the time of the payment. Later that day, the UC contacted BAUTISTA MORETA at the 7032 Telephone.  BAUTISTA MORETA agreed to meet the UC and proposed a meet location of 15 Donald Road in Boston.

29.     15 Donald Road is approximately 0.2 miles away from the Target Location of 238 Westview Street in Boston.

30.     At approximately 2:10 p.m., investigators did a spot check and saw the Cherokee parked outside of the Target Location.

31.     At approximately 4:00 p.m., investigators met with the same CS they had used for the October 22 transaction.  Investigators searched the CS's vehicle for currency or contraband and found none.  Investigators provided the CS with $7,000 in U.S. currency, the serial numbers of which investigators had previously logged.  The $7,000 was wrapped in green cellophane wrapping, then vacuumed sealed, then wrapped in green cellophane wrapping again.  Investigators equipped the CS's vehicle with video- and audio-recording devices.

32.     At approximately 4:09 p.m., an investigator saw the Cherokee arrive in front of the Target Location.  The investigator saw a Hispanic male exit the Cherokee and enter the Target Location.

33.     At approximately 4:22 p.m., the CS arrived at Donald Street and parked in the vicinity of 15 Donald Street.

34.     At approximately 4:30 p.m., BAUTISTA MORETA text-messaged the UC and said he would be there in two minutes.  Investigators believe BAUTISTA MORETA exited the back door of the Target Location.

35.     At approximately 4:34 p.m., BAUTISTA MORETA entered the CS's car carrying a reusable shopping bag.  BAUTISTA MORETA handed the shopping bag to the CS.  The CS handed the $7,000 to BAUTISTA MORETA.

36.     At approximately 4:35 p.m., BAUTISTA MORETA exited the CS's car. Investigators saw him walk back toward the Target Location and enter the Target Location.

37.     Investigators then met with the CS at a predetermined location.  The bag that BAUTISTA MORETA gave to the CS contained a first-aid kit.  Inside the first-aid kit was (1) a brick that was wrapped with duct tape, and (2) a plastic bag holding multiple plastic bags that contained an off-white substance.

38.     The substance in the first-aid kit field-tested positive for the presence of fentanyl. I believe the substance is fentanyl.

**Drug Traffickers' Use of Residences, Cell Phones, and Computers Generally**

39.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

40.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residence's records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of

amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period, regardless of whether they are physically in possession of drugs on the premises.

41.    Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residences.  Such documents include rental or storage property agreements and receipts.

42.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for drug traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances.  Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences.  Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

43.    Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and

businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

44.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. To accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the way they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

45.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

46.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is,

therefore, evidence of drug trafficking.  Moreover, the numbers of and the numbers dialed by cellular telephones can be evidence of drug trafficking.

47.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.   Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

48.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools.  When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet

are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

49.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the target of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

a.   controlled substances, such as fentanyl;

b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.   books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.   personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of

14

communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of

controlled substances and the expenditure of such income, including money

orders, wire transfers, cashier's checks and receipts, bank statements, passbooks,

checkbooks, and check registers, as well as consumer items such as electronic

equipment, vehicles, jewelry, and precious metals such as gold and silver, and

precious gems such as diamonds - it should be noted that possession of the

valuable items referenced in this paragraph, particularly by individuals with no

substantial legitimate source of income, is evidence of drug trafficking as opposed

to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce,

such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane

tickets, boarding passes, motel and hotel receipts, passports and visas, credit card

receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic

media utilized for communication, transportation, and data acquisition and

retention purposes related to acquiring and distributing illegal drugs and proceeds,

including incoming and outgoing call and text message logs, contact lists, photo

and video galleries, sent and received text messages, online searches and sites

viewed via the internet, online or electronic communications sent and received

(including email, chat, and instant messages), sent and received audio files,

navigation, mapping, and GPS files, telephone settings (including contact lists)

text messages, and related identifying information such as telephone identification

15

numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.   firearms and other dangerous weapons; and,

i.   identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

50.      Based on all of the evidence I have obtained in the course of this investigation, and for the reasons set forth above, I believe BAUTISTA MORETA, like many drug traffickers, uses his residence and/or stash locations in furtherance of their ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Location.

## CONCLUSION

51.      Wherefore, there is probable cause to believe BAUTISTA MORETA has committed the Target Offense, and that evidence, fruits, and instrumentalities of the Target Offense, described in Attachment B will be located at the Target Location, described in

Attachment A.

Respectfully submitted,

_____

Kyle Montagano, Special Agent
Drug Enforcement Administration


Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 this 5th day of November 2021.

_____
Hon. Jennifer C. Boal
United States Magistrate Judge

**ATTACHMENT A**

<u>Description of the Premises to be Searched</u>

238 Westview Street, Boston MA (hereinafter the "Target Location").  The "Target

Location" is described as follows:  238 Westview Street is one entrance to a three-story

apartment structure containing an unknown number of units.  There is a fenced-in backyard with

a rear exit.  Access to the "Target Location" is through a red door marked "238."  The access

door is the last door on the right while facing the building from Westview Street.  The "Target

Location" is pictured below.



**ATTACHMENT B**

Description of the Items to be Seized

From January 1, 2020 through the present, evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of a controlled substance) to be seized:

1. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

2. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

3. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities, including any keys to motor vehicles, real property, or commercial storage facilities.

4. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

5. Cellular telephones belonging to or used by Luis Sonier BAUTISTA MORETA and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking, located in the memory of any mobile telephone, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e. GPS data;

   f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.   Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.   Service provider handset unlock password(s) and any other passwords used to access the electronic data described above.

6.   For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant (the "computer equipment"):

a.   evidence of who used, owned, or controlled the computer equipment;

b.   evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other computer hardware or storage media;

d.   evidence of counter forensic programs and associated data that are designed to eliminate data;

e.   evidence of when the computer equipment was used;

f.   passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

g.   records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

7. Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

8. All computer hardware, computer software, and storage media.  Off site searching of these items shall be limited to searching for the items described in paragraph I.

During the execution of the search of the Target Location described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of the subject device and/or to hold the device in front of their faces.

### DEFINITIONS

For the purpose of this warrant:

1. "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

2. "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

3. "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

4

4. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

5. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

6. A "record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy=s authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.